GRACE HARBOR LUMBER CO. *v.* FRIEDMAN.

1. Evidence—Conversations—Lapse of Time.

   The impossibility of relating the words of a conversation held five years before renders such testimony questionable unless it finds support in intervening events.

2. Contracts—Promises—Question for Jury—Weight of Evidence.

   Evidence of conversations amounting only to admission by defendant bank's agent, deceased at time of trial, that he had made arrangements to pay plaintiff for building material used in building upon which defendant had foreclosed mortgage and was holding sheriff's deed *held,* sufficient to take issue of whether express promise to pay plaintiff was made by mortgagee to jury but against the overwhelming weight of the evidence, in view of the subsequent conduct of plaintiff's experienced credit man and officials representing defendant bank.

3. APPEAL AND ERROR—EVIDENCE—QUESTION FOR JURY—NEW TRIAL.
   Where evidence is such as to require submission of controlling issue of fact to jury but insufficient to sustain its verdict thereon, judgment entered in accordance therewith is set aside and new trial granted.

4. BANKS AND BANKING—CORPORATIONS—CHAIRMAN OF BOARD OF DIRECTORS—AUTHORITY—QUESTION FOR JURY.
   In action by materialman to recover payment for materials furnished for building upon which defendant bank had foreclosed mortgage and was holding sheriff's deed, under rule that a corporation may not receive and retain benefits of a completed transaction and deny authority of officer who produced it, evidence that chairman of board of directors had authority to represent bank *held,* sufficient to make issue of his authority a jury question.

NORTH, C. J., and BUTZEL and BUSHNELL, JJ., dissenting.

Appeal from Wayne; Marschner (Adolph F.), J. Submitted June 11, 1936. (Docket No. 59, Calendar No. 38,962.) Decided October 5, 1936. Rehearing denied November 9, 1936.

Action by Grace Harbor Lumber Company, a Michigan corporation, against Harry Friedman and wife and State Savings Bank of Ann Arbor to recover payment for building materials. From verdict and judgment for plaintiff against defendant bank, it appeals. Reversed and new trial ordered.

*Adrian D. Rosen (Harold M. Shapero,* of counsel), for plaintiff.

*Frank B. DeVine* and *Goodenough, Voorheis, Long & Ryan,* for defendant.

BUSHNELL, J. *(dissenting).* A jury found for plaintiff against defendant bank in the sum of $5,-

418.54 on the sole question of whether or not the bank made an express promise or agreement to pay for building materials furnished by the plaintiff.

Defendants Friedman were owners of property at Brush and Westminster in the city of Detroit which was incumbered with a mortgage in the sum of $12,000. The bank foreclosed and obtained a sheriff's deed dated January 2, 1930. About this time Friedman had ordered materials from plaintiff and others not connected with the instant litigation except as witnesses for plaintiff. Work of repairing and remodeling the property started immediately after the sheriff's deed was given and plaintiff continued to furnish material until July 23d, it all being billed as "sold to H. Friedman." Plaintiff's agent and attorney filed a claim of lien against the Friedmans, as the owners, on September 8th, but the lien was not foreclosed. The bank gave the Friedmans an option to repurchase the property which was extended to September 12, 1933, and permitted them to remain in possession.

Plaintiff began action by attachment against the Friedmans on January 13, 1932; afterwards the attachment was dissolved and the bank was joined as a defendant in the assumpsit action.

Daniel F. Zimmerman, chairman of defendant bank's board of directors and through whom plaintiff claims to have contracted with the bank, died October 6, 1932, three months before the bank was made a party defendant. Arthur Brown, attorney for the bank, who was mentioned in the testimony as having participated in certain negotiations for renewal of the mortgage, died September 21, 1932, and C. J. Walz, president of the bank, died June 8, 1935. The trial of the issues began on November 4, 1935, and the rule restricting the testimony of sur-

viving witnesses as to matters equally within the knowledge of the deceased was insisted upon and followed. 3 Comp. Laws 1929, § 14219.

Plaintiff produced in support of its contention certain employees of other material men who testified that the bank agreed to pay for materials furnished to the Friedman job. That of Herbert Rachar, credit manager for Ernst Fuel & Supply Company who met Zimmerman and Friedman on the job in March of 1930 is typical. He said:

"I told him that we had been supplying the job, that is, the Ernst Fuel & Supply Company had been supplying the job with masonry materials for about 30 days, and that I had found out in the meantime while we were making deliveries that the—that his bank had a sheriff's deed, and that I was there for the purpose of finding out who we were to look to for our money; that I was not satisfied with Mr. Friedman from that point on. And he said that—that the job had—it had gotten into a mess, and that they had taken it over and were going to clean it up and pay for the materials. I said that we had made up our minds—I had made up my mind that we weren't going to do anything further until we had something definite on that point. He said, 'You don't need to worry. We have taken over the job and we have made that same arrangement with other people supplying the lumber, and he said, 'Yes.' 'And they all right.' I saw one of the Grace Harbor trucks standing there, and I remarked that they were supplying the lumber, and he said, 'Yes.' 'And they are going to continue to supply because we made the same arrangements with them.' I said, 'That being the case, we will go ahead.'"

About a week later this witness called the Ann Arbor bank on "long distance" and "asked for an officer of the bank who would be familiar with the

Friedman-Westminster job.'' The girl who answered the phone went off the line just for a minute or two and then said: ''Mr. Walz will talk to you.'' Racher testified on this point as follows:

''I identified myself, and then I told Mr. Walz that we were the people supplying the Friedman-Westminster job, and that I talked to Mr. Zimmerman on the job a few days previous, and that I wanted to be sure—I wanted to know that he had authority. I didn't know what Mr. Zimmerman's capacity was, and I just wanted to verify it, and he said, 'Well, Mr. Zimmerman is handling that job for the bank, and whatever he says is okay.' So that was all there was to it.''

The deposition of cashier Herman F. Gross shows that the bank had other mortgages on Detroit property and that Zimmerman ''used to come in fairly often twice a week.''

''Q. He took care of the bank's Detroit business?
''A. Yes.''

At the time of delivery, Walz was president of the bank. Otto Ernst accompanied by Leitch of Grace Harbor Lumber Company and Cherry of Acme Clay Products called at the bank and were referred by the cashier to president Walz. They had a conversation about the situation and its possible solution; among other matters an option to the material men was discussed.

''Q. Do you recall anything being said about Mr. Zimmerman?
''A. He did say this, that Zimmerman was his righthand man, and reported to him on the progress of the building from time to time, being in Detroit practically every day; made his rounds on various jobs that they had—they were interested in, and he

got his report from Zimmerman on the progress of the building.''

Shortly before Friedman's option was about to expire, Ernst had another talk with Walz:

''*Q.* And what if anything was said on this occasion?

''*A.* 'Well, the thing is changed,' he said,—that there had been a new option made up again—we said, 'How come? You promised us that we—that we should have the consideration inasmuch as we were tied up with a lot of money there.' And, he said that his attorney advised me to the contrary, and consequently made up a new option.''

Appellant claims, in the main, lack of proof of the express contract or the authority of Zimmerman and that the court erred in various instructions to the jury.

The authorities are well briefed, but the facts are persistent that the bank found itself, in the words of Zimmerman, with a mess on its hands; that the material men who had begun deliveries to the Friedmans soon became aware of the possibility of non-payment and were unwilling to go further without being able to look to responsible parties. They took the usual businesslike precautions and while we do not invade the proper province of juries, we would have arrived at the same conclusion as to the bank's liability.

Our observation and holding in *Hunt* v. *Stromberg Motor Devices Co.,* 215 Mich. 483, is controlling:

''In this age of corporations, when so great a proportion of the country's business is carried on by them, * * * yet greater difficulties than formerly confront the outsider when called upon at his peril

to verify the authority of their agents and officers in a particular transaction according to the narrow rules of record evidence once more generally recognized, and yet often though not always applicable. The circumstances of particular cases frequently present controlling facts of force materially modifying them. * * *

"Corporate powers and purposes can only be expressed and performed through natural persons acting as its officers and agents."

While various statutes state the powers and duties of bank officers, nevertheless defendant is a corporation and the general rules of corporate conduct are applicable.

The bank was acting through Walz and Zimmerman, whose authority is unquestioned by any rebuttal testimony. There is ample testimony to support the verdict. We find no prejudicial error in the record and do not see any necessity for a lengthy discussion of the many authorities cited and quoted by counsel. They need not be distinguished as the facts speak for themselves.

The judgment should be affirmed, with costs.

NORTH, C. J., and BUTZEL, J., concurred with BUSHNELL, J.

FEAD, J. The principal question raised by counsel is whether the judgment should be reversed because the verdict was against the great weight of the evidence. The case was tried by plaintiff upon mingled theories of fraud, conspiracy, implied contract, express promise to pay, and unjust enrichment. With plaintiff's consent, the cause was submitted to the jury upon the sole issue of express promise.

Plaintiff's case rests primarily on Rachar's testimony of his conversation with Zimmerman. The impossibility of relating the words of a conversa-

tion held five years before renders such testimony questionable unless it finds support in intervening events. Rachar's statement that Zimmerman said the bank would pay for the materials is supported by no subsequent conduct but, on the contrary, is impeached and overbalanced by the unexplained and undisputed facts—that about three months after the claimed conversation Rachar made a sworn statement of lien, alleging that his firm had furnished the materials in pursuance of a contract with Friedman, not naming the bank as contractor or debtor, and that the Friedmans and Lanskys were the owners of the property, although he said he had the conversation with Zimmerman because the bank had a sheriff's deed and he was not satisfied to continue furnishing materials for Friedman; that in his telephone conversation with Walz, he did not mention Zimmerman's promise to pay, nor seek confirmation of it; that neither he nor his employer made claim to the bank or any officer that Zimmerman had made the promise; and evidently Rachar forgot to tell his employer of the arrangement because Mr. Ernst, with Mr. Leitch, vice-president and secretary of plaintiff, and another, had two conversations with Mr. Walz in 1931, in which they sought an option to buy the property in order to protect their accounts, finally were refused an option and none of them made a suggestion that the bank was liable for or had promised to pay their bills. Such conduct by a credit man of five years' experience, and by his employer, is persuasive that, if Rachar and Zimmerman had the conversation claimed, Rachar did not understand that Zimmerman had agreed to pay the bills.

Further, Rachar's testimony, if accepted, amounts only to an admission by Zimmerman that he had made arrangements with plaintiff to pay its account.

It was not direct evidence of the fact that such arrangement had been made. The admission may not have been true. The subsequent events are persuasive that, if made, it was not true. Plaintiff charged the materials to Friedman, not to the bank. It sent no bills to the bank. On September 8, 1930, it made sworn claim of lien, stating it had furnished the 'materials under contract with the Friedmans, naming the Friedmans and Lanskys as owners of the property and denying knowledge of any other owner or claimed owners. It participated in the conference in April and August, 1931, between the material men and Walz, in which the former were seeking an option in order to protect their accounts and, although the option was refused, made no claim of promise by Zimmerman or the bank to pay. It commenced this suit against the Friedmans in January, 1932, making affidavit in attachment that they owed the account. In its declaration it charged the common counts and also that the Friedmans had fraudulently contracted the obligation by falsely representing that they had arranged the refinancing of the property and would pay for the material. It made no claim whatever against the bank until January 9, 1933, three months after Zimmerman's death, had made it impossible for him to deny alleged conversations or arrangements. It then made the bank a party to the suit, claimed no promise to pay, but charged it with conspiracy with Friedman to defeat the liens and claims by means of the bank permitting Friedman to remain in possession, giving him option to repurchase and representing that the financing had been completed and the Friedmans would pay. Not until December 21, 1933, did plaintiff claim a promise by the bank. It was then claimed only by general allegations in the declaration, including the common counts, running against all the defendants.

Business men who contract with a responsible person do not wholly ignore his obligation to pay them and pursue an irresponsible party for years and until their true debtor or his contracting agent is dead.

The conduct of the bank lends no support to plaintiff's claim. One can hardly imagine that the bank promised payment of the material men during the redemption period and afterward gave the Friedmans option to repurchase on payment of the mortgage debt with subsequent charges, without legal right, contract or provision for reimbursement for the material bills. In the negotiations between the bank and the material men for an option to the latter, the bank expressed its sole concern to be repayment of the mortgage and charges in connection therewith, without thought or suggestion by anyone of any other charge.

To permit the verdict to stand is to ignore the obvious force of these cumulative facts and to put an unjustified premium on verbal testimony which may be the result of misunderstanding of, or inability to repeat, words used in a conversation, or worse.

The situation is that, while there was sufficient testimony to require submission to the jury of the issue of an express promise to pay plaintiff, the overwhelming testimony was to the contrary, and the verdict was against the great weight of the evidence. In such case, the court does not render a contrary judgment but sets aside the judgment entered and orders a new trial.

Aside from the question of Zimmerman's authority to contract for the bank, the other errors alleged will not be likely to arise on new trial and need not be discussed. Under the testimony, and especially the rule that a corporation may not receive and re-

tain the benefits of a completed transaction and deny the authority of its officer who produced it, there was sufficient evidence of Zimmerman's authority to represent the bank to make it a jury question.

Reversed, with costs and new trial.

WIEST, SHARPE, and TOY, JJ., concurred with FEAD, J. POTTER, J., did not sit.